UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEROME CHOICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21-cv-0060 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| PATRICIA MICHALAK, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Defendant Patricia Michalak moves to dismiss Plaintiff Jerome Choice's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defendant's Motion to Dismiss (Dkt. No. 66).)[1] For the following reasons, we grant Michalak's motion.[2]

**BACKGROUND**

We take the following facts from the operative Second Amended Complaint, "documents that are critical to the [Second Amended Complaint] and referred to in it, [] information that is subject to proper judicial notice[,]" and any additional facts set forth in Choice's opposition, "so long as those facts are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (quotation marks omitted). We have accepted as true all well-pleaded factual allegations and drawn all reasonable inferences in Choice's favor. *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020).

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

[2] We also decline Choice's request for argument (*see* Memorandum in Opposition to Defendant's Motion to Dismiss ("Opp'n") (Dkt. No. 71) at 16) because the parties' briefs adequately present the issues, and oral argument would not significantly aid us.

At the time of the complained-of incident, Choice was a pretrial detainee housed at the Metropolitan Correctional Center ("MCC") in Chicago, Illinois.[3] (Second Amended Complaint ("SAC") (Dkt. No. 61) ¶ 6.) Michalak was a Nurse Practitioner in the MCC Health Services Department. (*Id.* ¶ 7.) In this role, she "provided medical care to the inmates housed at the MCC." (*Id.*)

In May 2018, Choice injured his left hand while playing basketball. (*Id.* ¶ 10.) An X-ray showed that Choice had fractured his left thumb, and he was referred to a hand specialist, Dr. Orhan Kaymakcalan. (*Id.* ¶¶ 12, 13.) Dr. Kaymakcalan operated on Choice's thumb at the end of July 2018. (*Id.* ¶¶ 14, 15.) As part of the operation, Dr. Kaymakcalan inserted three pins to stabilize the fractured bone and facilitate healing. (*Id.* ¶ 16.) A bulky hand dressing was applied to Choice's left hand at the end of the operation. (*Id.* ¶ 17.)

Michalak changed Choice's dressing on two occasions in August 2018. (*Id.* ¶¶ 19, 20.) The first time, Michalak changed the dressing without displacing or removing any pins. (*Id.* ¶ 19.) The second time, however, "one of the surgical pins was pulled out approximately half of an inch while [Michalak] was changing the dressing." (*Id.* ¶ 20.) Michalak acknowledged that she had erred "by pulling up the pin while she was changing the dressing" and then left the room. (*Id.* ¶¶ 21, 22.) When she returned, Michalak told Choice that she had made a few calls but received no answer, and that "she was unable to discuss the protruding pin with the MCC Clinical Director, Dr. Brij Mohan." (*Id.* ¶ 22.) Without consulting Choice, Michalak then

---

[3] The MCC is operated by the Federal Bureau of Prisons ("BOP"). *See* Federal Bureau of Prisons, MCC Chicago, https://www.bop.gov/locations/institutions/ccc/ (last visited Sept. 5, 2022). The BOP, in turn, is part of the Department of Justice. *United States v. Reyes-Sanchez*, 509 F.3d 837, 838 (7th Cir. 2007).

completely removed the pin from Choice's hand—causing him severe pain—and threw the pin in the garbage. (*Id.* ¶¶ 24–26.)

Michalak's medical notes tell a different story. In these notes, she wrote that one of Choice's pins was accidentally pulled out two inches and that she secured the pin with gauze and tape. (*Id.* ¶ 30.) Michalak also wrote that she called the hand surgeon's office for guidance and that a secretary, who was relaying information from a physician's assistant, told her to remove the pin if Choice could not be sent to the hand surgeon's office that day. (*Id.* ¶ 31.)

Shortly after Michalak removed the pin, Dr. Mohan reprimanded her for removing and discarding the pin. (*Id.* ¶ 27.) A MCC Health Services administrator also told Dr. Mohan that Michalak's conduct was unacceptable. (*Id.* ¶ 28.) Dr. Mohan thereafter ordered personnel not to remove the pins when changing Choice's dressing. (*Id.* ¶ 29.)

"Following the incident, Dr. Mohan placed an urgent consultation request so that [Choice] could see the hand surgeon." (*Id.* ¶ 35.) Two days after the incident, Choice saw Dr. Kaymakcalan again. (*Id.* ¶ 36.) Dr. Kaymakcalan recommended continued immobilization in the near term "but explained that complications from the removed pin may need to be addressed in the future." (*Id.*) In the following months, Choice participated in physical therapy, but he continued to experience severe pain, and his ability to perform daily tasks remained impaired. (*Id.* ¶¶ 37, 38.)

Choice ultimately underwent a second surgery on his left thumb in September 2019. (*Id.* ¶ 39.) As part of this surgery, "a pin was inserted in his hand and remained in place without any issues," and the pin was later removed "by the hand surgeon's office without complications." (*Id.* ¶ 40.) Although Choice's left hand has improved since the second surgery, he still requires

medication to manage the pain and cannot perform certain tasks, "such as manual labor and lifting objects more than 10 to 15 pounds with his left hand." (*Id.* ¶¶ 41, 42.)

In the meantime, Choice grieved the incident using the BOP's administrative grievance process. (*Id.* ¶¶ 43, 44.) Choice explained that Michalak wrongly removed the pin without consulting him or any knowledgeable medical authority and that the removal caused him severe pain and required him to undergo a second surgery. (*Id.* ¶¶ 45–47.) Choice requested an investigation into Michalak's contention that she had consulted the hand surgeon before removing the pin. (*Id.* ¶ 49.) He "also sought prompt surgery and compensation for the incident." (*Id.* ¶ 50.) Choice's grievance was denied at each stage of the administrative process: it "was denied in the informal grievance process (BP-8), denied by the Warden (BP-9), denied by the Regional Director (BP-10), and finally denied by the administrator of the National Inmate Appeals (BP-11)."[4] (*Id.* ¶ 51.)

## LEGAL STANDARD

At the Rule 12(b)(6) stage, "we test the sufficiency of the complaint, not the merits of the case." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022). "We construe the complaint in the light most favorable to [the] plaintiff, accept all well-pleaded facts as true, and draw reasonable inferences in [the] plaintiff's favor." *Taha v. Int'l Bhd. of Teamsters*, 947 F.3d 464, 469 (7th Cir. 2020). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the

---

[4] BP-8, BP-9, BP-10, and BP-11 refer to the forms a federal pretrial detainee must file as part of the BOP's administrative grievance process. *See Tyner v. Nowakowski*, No. 19 C 1502, 2021 WL 4318085, at *5 (N.D. Ill. Sept. 23, 2021).

4

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

Choice alleges that Michalak violated his right to constitutionally adequate medical care when she deliberately removed the surgical pin from his hand, which caused severe pain and required a second surgery to heal his fractured thumb. (SAC ¶¶ 53, 54.) Because Choice was a federal pretrial detainee at the time, this right arises under the Fifth Amendment's Due Process Clause. (*Id.* ¶¶ 2, 5, 6); *Sides v. City of Champaign*, 496 F.3d 820, 827–28 (7th Cir. 2007); *Daniels v. Janca*, No. 17 C 906, 2019 WL 2772525, at *4 (N.D. Ill. July 2, 2019). Choice seeks compensatory and punitive damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). (SAC ¶ 1.)

Michalak moves to dismiss Choice's claim on three grounds. First, she contends that Choice has not alleged a constitutional violation. (Memorandum in Support of Defendant's Motion to Dismiss ("Mem.") (Dkt. No. 67) at 8–11.) Second, she contends that we should not imply a *Bivens* remedy for Choice's claim. (*Id.* at 11–22.) Third, she contends that she is entitled to qualified immunity. (*Id.* at 22–26.) We address Michalak's *Bivens* argument first because it presents an issue that is "antecedent to any question about the merits of [Choice's] claim."[5] *Earle v. Shreves*, 990 F.3d 774, 778 (4th Cir. 2021) (quotation marks omitted).

In 1871, Congress passed a statute that would later be codified as 42 U.S.C. § 1983. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). This statute authorizes suits for money damages

---

[5] Contrary to Choice's assertion, our screening order did not already find that he had a cognizable *Bivens* remedy. (*See* Opp'n at 2.) In screening Choice's original complaint, we did not say anything about this issue (*see* Dkt. No. 13), so we could not have made any findings on it. *See United States v. Richardson*, 558 F.3d 680, 681 (7th Cir. 2009). In any event, it is more appropriate to consider the issue now, when we have the benefit of briefing from the parties.

5

caused by the constitutional violations of state government officials. *Id.* But Congress did not create a statute providing a specific damages remedy for constitutional violations caused by *federal* government officials. *See id.* And there still is no such statute. *Earle*, 990 F.3d at 777; *Zhang v. Schuster*, No. 18-cv-3283, 2022 WL 615015, at *7 (N.D. Ill. Mar. 2, 2022).

A century after § 1983's enactment, the Supreme Court issued its opinion in *Bivens*. In *Bivens*, the Supreme Court recognized for the first time "an implied cause of action allowing individuals to recover damages for unconstitutional conduct by federal agents acting under color of federal law." *Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 561 (7th Cir. 2022); *Earle*, 990 F.3d at 778. Specifically, *Bivens* implied "'a cause of action under the Fourth Amendment' against federal agents who allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations." *Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022) (quoting *Bivens*, 403 U.S. at 397). Over the next decade, the Supreme Court relied upon *Bivens* to recognize causes of action in two more instances: in *Davis v. Passman*, 442 U.S. 228 (1979), the Court recognized a former congressional staffer's sex discrimination claim under the Fifth Amendment, and in *Carlson v. Green*, 446 U.S. 14 (1980), the Court recognized a "federal prisoner's inadequate-care claim under the Eighth Amendment." *Id.* But since then, the Supreme Court "has not implied additional causes of action under the Constitution," even though circuit and district courts have relied upon *Bivens* to do so "for a wide range of alleged constitutional violations." *Id.*; *Greenpoint Tactical*, 38 F.4th at 561.

In June 2022, the Supreme Court issued *Egbert v. Boule*, its most recent decision refusing to imply a constitutional cause of action under *Bivens*. In *Egbert*, the Court described a two-step analysis for evaluating claims under *Bivens*. 142 S. Ct. at 1803. At the first step, we "ask whether the case presents a new *Bivens* context." *Id.* (quotation marks omitted). If so, we then

6

ask whether "there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* (quotation marks omitted). Nonetheless, these "steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* And "in all but the most unusual circumstances," the answer to this question is "yes." *See id.* at 1800, 1803. We conduct our *Bivens* analysis knowing that the Supreme Court has repeatedly emphasized that recognizing a new cause of action under *Bivens* is "a disfavored judicial activity." *E.g.*, *id.* at 1803; *Hernández v. Mesa*, 140 S. Ct. 735, 742 (2020); *Ziglar*, 137 S. Ct. at 1857; *Fosnight v. Jones*, 41 F.4th 916, 924 n.3 (7th Cir. 2022). As the Tenth Circuit recently put it: "The Supreme Court's message could not be clearer—lower courts expand *Bivens* claims at their own peril." *Silva v. United States*, --- F.4th ----, 2022 WL 3591107, at *1 (10th Cir. Aug. 1, 2022).

We start our analysis by asking whether Choice's case presents a new *Bivens* context. A case presents a new *Bivens* context if it is "meaningfully different from the three cases in which the [Supreme] Court has implied a damages action." *Egbert*, 142 S. Ct. at 1803 (quotation marks and alteration omitted). The Supreme Court has never set forth an exhaustive list of the differences it considers meaningful, but it has explained that new *Bivens* contexts exist where the case-at-hand involves a new constitutional right, a new category of defendants, or special factors that the previous *Bivens* cases did not consider. *See id.* at 1803, 1807; *Ziglar*, 137 S. Ct. at 1859–60, 1864–65. In view of the Supreme Court's "expressed caution about extending the *Bivens* remedy," even arguably small differences between a claim and the previously recognized *Bivens* claims can satisfy the new-context inquiry. *Ziglar*, 137 S. Ct. at 1865.

For the new-context inquiry, *Bivens*, *Davis*, and *Carlson* provide the standards for comparison. *See Egbert*, 142 S. Ct. at 1802–03. Here, Choice alleges that Michalak, a nurse practitioner at the MCC, violated his rights under the Fifth Amendment's Due Process Clause by providing him with inadequate medical care while he was a federal pretrial detainee. (SAC ¶¶ 2, 5–7, 53, 54.) Choice's claim cannot be said to involve the same context as *Bivens* itself, which implied a cause of action under the Fourth Amendment for an allegedly unlawful arrest and search, or *Davis*, which implied a cause of action under the Fifth Amendment for sex discrimination. *See Egbert*, 142 S. Ct. at 1802; *Hernández*, 140 S. Ct. at 741. And neither party contends otherwise. Thus, the question is whether Choice's claim is meaningfully different from the claim in *Carlson*.

In *Carlson*, the plaintiff brought suit on behalf of her deceased son's estate, alleging that the failure of federal prison officials to give her son adequate medical care after he had an asthmatic attack caused his death. 446 U.S. at 16 & n.1. The Court held that the plaintiff had a *Bivens* remedy based on a violation of the Eighth Amendment's Cruel and Unusual Punishment Clause. *See id*. at 17–19.

Although Choice's claim, like the claim in *Carlson*, seeks redress against a federal employee for inadequate medical care, Choice's claim is meaningfully different because it implicates a different constitutional right. *Egbert*, 142 S. Ct. at 1807 ("[A] new context arises when there is a new constitutional right at issue[.]" (quotation marks omitted)). Choice's claim is predicated on his right as a federal pretrial detainee to due process under the Fifth Amendment. (SAC ¶¶ 5, 53); *Daniels*, 2019 WL 2772525, at *4. In contrast, the claim in *Carlson* was predicated on the prisoner's right to be free from cruel and unusual punishment under the Eighth Amendment. *Ziglar*, 137 S. Ct. at 1855; *Carlson*, 446 U.S. at 17. When

compared to *Carlson*, Choice's claim involves a different type of plaintiff (a pretrial detainee, not a convicted prisoner), a different constitutional right (the Fifth Amendment, not the Eighth Amendment), and a different governing standard ("objective unreasonableness," not "deliberate indifference"). *See Ziglar*, 137 S. Ct. at 1864 ("The constitutional right is different here, since *Carlson* was predicated on the Eighth Amendment and this claim is predicated on the Fifth."); *Reed v. Bowen*, 769 F. App'x 365, 369 (7th Cir. 2019) (a pretrial detainee's "claim differs from a prisoner's [claim] because pretrial detainees (unlike convicted prisoners) cannot be punished at all" (quotation marks omitted));[6] *Daniels*, 2019 WL 2772525, at *4 (a federal pretrial detainee's inadequate medical care claim is subject to an "objective unreasonableness" inquiry, "not the Eighth Amendment's deliberate indifference standard"). Thus, Choice's claim presents a new *Bivens* context. *See Ziglar*, 137 S. Ct. at 1853–54, 1864 (finding that a detainee's mistreatment claim based on the Fifth Amendment's substantive due process component presented a different *Bivens* context than *Carlson*'s Eighth Amendment claim even though the latter was also based on prisoner mistreatment).

Relying primarily on *Bistrian v. Levi*, 912 F.3d 79 (3d Cir. 2018), Choice argues that his claim does not present a new *Bivens* context. (Opp'n at 8–9.) In *Bistrian*, the Third Circuit held that the plaintiff, a federal pretrial detainee, had a cognizable *Bivens* remedy for his failure-to-protect claim based on the Fifth Amendment. 912 F.3d at 83–84, 88. With respect to the new-context inquiry, the court found that the plaintiff's claim did not present a new *Bivens* context

---

[6] Although *Reed* discussed the rights that a state pretrial detainee derives from the Fourteenth Amendment's Due Process Clause, 769 F. App'x at 367–69, due process under both the Fifth and Fourteenth Amendments prohibits any punishment, whereas the Eighth Amendment prohibits only "cruel and unusual" punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). So, just as a state pretrial detainee's Fourteenth Amendment due process claim differs from a convicted prisoner's Eighth Amendment claim, so does a federal pretrial detainee's Fifth Amendment due process claim.

because its own circuit precedent recognized such a claim and, more significantly, so did the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994), which "assessed a 'failure to protect' claim brought under the Eighth Amendment and *Bivens* as a result of prisoner-on-prisoner violence." *Id.* at 90. Although acknowledging that *Farmer* "did not explicitly state that it was recognizing a *Bivens* claim" for a failure-to-protect claim under the Eighth Amendment, the *Bistrian* court interpreted the opinion as doing so. *Id.* at 90–91. Moreover, as the court saw it, the fact that the plaintiff's claim arose under the Fifth Amendment, not the Eighth Amendment as in *Farmer*, was not a meaningful difference. *Id.* at 91. Because "the Fifth Amendment provides the same, if not more, protection for pretrial detainees than the Eighth Amendment does for imprisoned convicts," the *Bistrian* court reasoned, it was not extending *Bivens* to a new context. *Id.* Finally, the court found that the Supreme Court's decision in *Ziglar* did not contradict its reasoning and did not implicitly overrule *Farmer*. *Id.*

*Bistrian* fails to convince us that Choice's claim does not present a new *Bivens* context. At the outset, we do not find *Bistrian*'s reliance on *Farmer* persuasive. Because "the only question before the *Farmer* Court was the proper standard for deliberate indifference, not whether to extend *Bivens* and recognize an implied cause of action for Eighth Amendment conditions of confinement claims," the Court's actions in *Farmer* were "akin to 'assuming without deciding'" the *Bivens* issue "to focus on the question presented on appeal." *Oden v. True*, No. 3:18-cv-600-GCS, 2020 WL 4049922, at *4 (S.D. Ill. July 20, 2020); *see also Silva v. Ward*, No. 16-cv-185-WMC, 2019 WL 4721052, at *4 (W.D. Wis. Sept. 26, 2019) (explaining that the *Farmer* Court merely assumed, "without analysis, that a federal prisoner could bring a *Bivens* claim against prison officials" based on their failure to protect him). A case that assumes the existence of a certain *Bivens* remedy does not constitute a holding that the remedy in fact

exists. *Egbert*, 142 S. Ct. at 1807 (the Court's assumption in a prior case that a *Bivens* remedy might be available for a First Amendment retaliation claim did not constitute a holding that *Bivens* extended to First Amendment claims); *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 460 (7th Cir. 2006) ("[A]ssumptions are not holdings."). We see no reason to treat *Farmer* any differently, especially when the Supreme Court has consistently omitted *Farmer* from the list of cases that recognize *Bivens* causes of action. *E.g.*, *Egbert*, 142 S. Ct. at 1802; *Hernández*, 140 S. Ct. at 741; *Ziglar*, 137 S. Ct. at 1854–55. Indeed, *Egbert* makes clear that there are three— and only three—cases that courts should consider when determining whether a new *Bivens* context is presented: *Bivens*, *Davis*, and *Carlson*. 142 S. Ct. at 1802–03; *see also Ziglar*, 137 S. Ct. at 1855 ("These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself.").

We also disagree with *Bistrian*'s conclusion that a claim arising out of the Fifth Amendment presents the same *Bivens* context as a claim arising out of the Eighth Amendment. Although it may be true "that the Fifth Amendment provides the same, if not more, protection for pretrial detainees than the Eighth Amendment does for imprisoned convicts," *Bistrian*, 912 F.3d at 91, a similar argument garnered the support of only the dissenting Justices in *Ziglar*. *See Ziglar*, 137 S. Ct. at 1877–78 (Breyer and Ginsburg, JJ., dissenting) ("Where the harm is the same, where this Court has held that both the Fifth and Eighth Amendments give rise to *Bivens*' remedies, and where the only difference in constitutional scope consists of a circumstance (the absence of a conviction) that makes the violation here worse, it cannot be maintained that the difference between the use of the two Amendments is 'fundamental.'"). The Justices in the *Ziglar* majority, however, found that the plaintiff's Fifth Amendment claim based on prisoner mistreatment presented a different *Bivens* context than *Carlson*'s Eighth Amendment claim, even

11

though the latter was also based on prisoner mistreatment. *Ziglar*, 137 S. Ct. at 1864–65 (majority opinion). What is more, we do not read *Egbert*'s unequivocal statement that "a new context arises when there is a new constitutional right at issue," 142 S. Ct. at 1807 (quotation marks omitted), as leaving any leeway to conclude that two different constitutional rights present the same *Bivens* context because they may, in practice, prohibit similar conduct.[7]

Because Choice's inadequate medical care claim under the Fifth Amendment presents a new *Bivens* context, we now must consider whether any special factors counsel against recognizing a *Bivens* remedy. "[I]f a claim arises in a new context, a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1803 (quotation marks omitted). In fact, the existence of even one special factor forecloses a *Bivens* remedy. *See, e.g., id.* ("If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." (quotation marks omitted)); *id.* at 1805 ("A court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed." (quotation marks omitted; emphases in original)). Here, at least three special factors make it inappropriate to recognize a *Bivens* remedy for Choice's claim.

First, an alternative remedy is available, which "is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 1804 (quotation marks omitted).

---

[7] Choice also cites two district court cases to support his assertion that his *Bivens* claim is not new: *Laurent v. Borecky*, 17-CV-3300 (PKC)(LB), 2018 WL 2973386 (E.D.N.Y. June 12, 2018), and *Torres v. Licon Vitale*, 20-CV-3787 (LLS), 2020 WL 3872151 (S.D.N.Y. July 9, 2020). (Opp'n at 8.) For the reasons just discussed, however, we disagree with *Laurent*'s conclusion that an inadequate medical care claim under the Fifth Amendment does not present a new *Bivens* context. *See* 2018 WL 2973386, at *4–5. And *Torres* merely cites to *Laurent* without analysis, 2020 WL 3872151, at *3, so it does not anything to Choice's argument.

Choice had the opportunity to grieve Michalak's conduct through the BOP's Administrative Remedy Program. *See Johnson v. United States*, No. 14 C 10461, 2016 WL 3387156, at *1–2 (N.D. Ill. June 20, 2016) (MCC inmate was required to exhaust his remedies using BOP's Administrative Remedy Program). This program, which allowed Choice to seek formal review of issues relating to any aspect of his confinement, 28 C.F.R. § 542.10, provides a "means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). And Choice availed himself of this program, proceeding through each of the program's four stages. (SAC ¶¶ 43–51.) As the Supreme Court and numerous lower courts have recognized, the availability or use of the BOP's administrative remedy process counsels against recognizing a *Bivens* remedy. *E.g.*, *Malesko*, 534 U.S. at 74; *Grady v. Kinder*, 799 F. App'x 925, 927–28 (7th Cir. 2020); *Goree v. Serio*, 735 F. App'x 894, 895 (7th Cir. 2018); *Silva*, 2022 WL 3591107, at *4–5; *Earle*, 990 F.3d at 780; *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 524 (6th Cir. 2020); *Clark v. True*, No. 20-cv-00049-JPG, 2021 WL 3860461, at *4 (S.D. Ill. Aug. 30, 2021); *Sargeant v. Barfield*, No. 19 CV 50187, 2021 WL 2473805, at *2–3 (N.D. Ill. June 17, 2021).

Choice contends that "'[t]he administrative grievance process is not an alternative because it does not address [his] harm, which could only be remedied by money damages.'" (Opp'n at 11–12 (quoting *Bilstrian*, 912 F.3d at 92).) This contention is unavailing. The point of a *Bivens* remedy is not to compensate a plaintiff for his harm, but to deter individuals from committing constitutional violations. *Egbert*, 142 S. Ct. at 1806 ("*Bivens* is concerned *solely* with deterring the unconstitutional acts of individual officers[.]" (quotation marks omitted; emphasis added)). Moreover, an alternative remedy need not "provide complete relief" for the alleged violation or be as "effective as an individual damages remedy" to foreclose a *Bivens*

13

remedy. *Id.* at 1804, 1807 (quotation marks omitted); *see also Malesko*, 534 U.S. at 69 ("So long as the plaintiff ha[s] an avenue for some redress, bedrock principles of separation of powers foreclose[s] judicial imposition of a new substantive liability."). Although the BOP's administrative remedy process does not "permit an award of money damages," *Earle*, 990 F.3d at 780, it is still an alternative remedy for purposes of our analysis. *Grady*, 799 F. App'x at 928 (rejecting the plaintiff's contention that the unavailability of damages from the federal prison's administrative remedies program meant that a *Bivens* claim must be available). Indeed, the Supreme Court explained more than two decades ago that the BOP's Administrative Remedy Program was an available alternative remedy for an inadequate medical care claim. *Malesko*, 534 U.S. at 64–65, 74. Especially in view of the Court's recent approval of this explanation, *Egbert*, 142 S. Ct. at 1806, we cannot conclude otherwise.

Second, Congress's decision not to authorize damages claims for federal pretrial detainees counsels hesitation before recognizing a *Bivens* remedy. *See Ziglar*, 137 S. Ct. at 1865 ("[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation."). In 1995, Congress passed the Prison Litigation Reform Act ("PLRA"), which applies to both pretrial detainees and convicted prisoners. *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015). In doing so, Congress had "specific occasion" to address the proper way to remedy alleged violations of pretrial detainees' constitutional rights, yet it ultimately decided not to "provide for a standalone damages remedy against federal jailers." *See Ziglar*, 137 S. Ct. at 1865. This suggests that "Congress chose not to extend the *Carlson* damages remedy" to constitutional violations inflicted on pretrial detainees. *See id.*

Choice argues that three cases—*Bistrian* (discussed earlier), *Hoffman v. Preston*, 26 F.4th 1059 (9th Cir. 2022), and *Pinson v. United States Department of Justice*, 514 F. Supp. 3d 232

(D.D.C. 2021)—show that "the PLRA does not foreclose a damages remedy against federal prison officials by silence or by establishing an exhaustion requirement." (Opp'n at 12.) In *Bistrian*, the Third Circuit downplayed the PLRA's silence "about the availability of *Bivens* remedies" because the PLRA governs the process by which prisoners must bring claims in federal court, including *Bivens* claims, and a statute that regulates this process "cannot rightly be seen as dictating that a *Bivens* cause of action should not exist at all." 912 F.3d at 92–93. The Ninth Circuit in *Hoffman* agreed with *Bistrian*'s conclusion that the PLRA's silence does not suggest an intent to make *Bivens* remedies unavailable. 26 F.4th at 1070. According to the *Hoffman* court, "[n]o significant meaning can be attributed to the fact that Congress said nothing [in the PLRA] about the availability or unavailability of monetary damages to incarcerated plaintiffs" because the PLRA reflects "congressional intent to make more rigorous the process prisoners must follow before bringing a federal damages lawsuit, rather than a desire to prevent prisoners from seeking damages in federal court altogether." *Id*. at 1070–71 (quotation marks omitted). And the district court in *Pinson* reasoned that allowing the PLRA's silence to justify denying a *Bivens* remedy "would arguably foreclose all *Bivens* claims brought in the prison context, which would run counter to the Supreme Court's ruling in *Carlson*." 514 F. Supp. 3d at 244 n.6 (quotation marks omitted).

      We do not find these cases persuasive. For one thing, our reliance upon the PLRA's silence does not foreclose all *Bivens* claims brought in the prison context, only those claims like Choice's that are *beyond* the context authorized by *Carlson*. In other words, our analysis says nothing about claims that present the same *Bivens* context as *Carlson*. As such, determining that the PLRA's silence counsels against recognizing a *Bivens* remedy for Choice does not contradict *Carlson* in any way.

Furthermore, we do not think the Supreme Court would find convincing the procedural/substantive distinction relied upon by *Bistrian* and *Hoffman* to discount the PLRA's relevance. To the contrary, *Ziglar* specifically recognized that the PLRA changed "the way prisoner abuse claims must be brought in federal court"—*i.e.*, the process of bringing these claims—yet still deemed it "clear that Congress had specific occasion to consider the matter of prisoner abuse and *to consider the proper way to remedy those wrongs*." 137 S. Ct. at 1865 (emphasis added). Nor can we overlook or reject this discussion simply because the *Ziglar* Court ended it by saying "[i]t *could be argued* that this *suggests* Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Id.* (emphases added); *see Hoffman*, 26 F.4th at 1070 (relying upon the emphasized language to treat the discussion as an argument it was free to reject); *Bistrian*, 912 F.3d at 93 n.22 (responding to this discussion by asserting that "[i]t is equally, if not more, likely, however, that Congress simply wanted to reduce the volume of prisoner suits by imposing exhaustion requirements, rather to eliminate whole categories of claims through silence and implication"). In view of the Supreme Court's repeated emphasis on how disfavored it is for courts to imply new *Bivens* causes of action, *Ziglar*'s use of a few equivocating words does not justify ignoring the discussion's indication that the PLRA's silence forecloses new *Bivens* remedies in the prison context. Choice's reliance on *Bistrian*, *Hoffman*, and *Pinson* does not help his cause.

Third, recognizing a *Bivens* remedy for a prison-based inadequate care claim "present[s] a risk of interference with prison administration." *Callahan*, 965 F.3d at 524. The tasks required to run prisons, including the provision of medical care, "fall 'peculiarly within the province of the legislative and executive branches,'" and "[g]iven the array of challenges facing prison administration and the complexity of those problems, 'separation of powers concerns counsel a

16

policy of judicial restraint[.]'" *See id.* (quoting *Turner v. Safley*, 482 U.S. 78, 85 (1987)); *see also Ziglar*, 137 S. Ct. at 1857 ("[S]eparation-of-powers principles are or should be central to the [*Bivens*] analysis."). It is also quite possible that "[t]he prospect of personal liability" for actions in providing medical care to federal pretrial detainees would make it more difficult for the BOP to hire and retain medical professionals to provide this care. *See Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988). Congress is in a better position to determine whether the benefits of recognizing a damages remedy for federal pretrial detainees' inadequate care claims is outweighed by this risk or any other consequences that might follow. *See Egbert*, 142 S. Ct. at 1802–03 (explaining that "Congress is far more competent than the Judiciary to weigh" policy considerations such as administrative costs and "the impact on governmental operations systemwide" (quotation marks omitted)); *Hernández*, 140 S. Ct. at 742 ("Congress is best positioned to evaluate whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government based on constitutional torts." (quotation marks omitted)).

Choice counters these concerns by arguing that "[i]nadequate-care claims 'have been allowed for [m]any years' so 'there is no good reason to fear that allowing [his] claim will unduly affect the independence of the executive branch in setting and administering policies.'" (Opp'n at 12–13 (quoting *Bistrian*, 912 F.3d at 93).) But we are not as certain as the *Bistrian* court that allowing a new category of inadequate care claims (those brought by federal pretrial detainees) would not hamper the BOP's ability to run its facilities. *See Egbert*, 142 S. Ct. at 1803 ("Even in a particular case, a court likely cannot predict the systemwide consequences of recognizing a cause of action under *Bivens*." (quotation marks omitted)). In addition, the Ninth Circuit similarly reasoned that there was no reason "to hesitate in extending *Bivens*" to a First

17

Amendment retaliation claim due to the claim's "well-established" status, *Boule v. Egbert*, 980 F.3d 1309, 1316 (9th Cir. 2020), and the Supreme Court found this reasoning without merit, *Egbert*, 142 S. Ct. at 1807–08. As the *Egbert* Court explained, that plaintiffs often raise a particular type of claim "is not a reason to afford them a cause of action to sue federal officers for money damages." *Id.* at 1808. "If anything, that [certain] claims are common, and therefore more likely to impose a significant expansion of Government liability, counsels against permitting *Bivens* relief." *Id.* (quotation marks and internal citation omitted). Thus, the "well-established" status of other inadequate care claims does not justify recognizing a damages remedy for Choice's inadequate care claim.

Finally, we acknowledge Choice's argument that it would be unjust if a federal prisoner—who has been convicted of a crime—is entitled to seek damages for inadequate medical care while a federal pretrial detainee—who is still presumed innocent—cannot. (*See* Opp'n at 10–11.) But whether we "*should* provide for a wrong that would otherwise go unredressed" is not the question before us. *Egbert*, 142 S. Ct. at 1804 (quotation marks omitted; emphasis added); *see also Hernández*, 140 S. Ct. at 741 ("[W]hen a court recognizes an implied claim for damages on the ground that doing so furthers the 'purpose' of the law, the court risks arrogating legislative power."). Our task is only to determine whether we, "rather than the political branches, [are] better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." *Egbert*, 142 S. Ct. at 1804 (quotation marks omitted). Because special factors give us reason to think that Congress is better equipped for this job, "no *Bivens* action may lie." *Id.* at 1803.

In sum, Choice's inadequate medical care claim under the Fifth Amendment presents a new *Bivens* context, and at least three special factors—an alternative remedy, congressional

18

silence, and the risk of interference with the BOP's administration—counsel against recognizing a *Bivens* remedy. Choice therefore cannot pursue his Fifth Amendment claim against Michalak under *Bivens*.

## CONCLUSION

For the foregoing reasons, we grant Michalak's motion to dismiss (Dkt. No. 66). We dismiss Choice's Fifth Amendment claim for damages under *Bivens* with prejudice. The status hearing set for September 15, 2022, is stricken, and this civil case is terminated. It is so ordered.[8]

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: September 6, 2022

---

[8] We thank Choice's recruited counsel, Stephen Schwab, and Robert Muttilainen, who also appeared on Choice's behalf, for their able representation of Choice in this case.